## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

| | |
|---|---|
| ADVANTAGE INDUSTRIAL SYSTEMS, LLC<br><br>PLAINTIFF<br><br>v.<br><br>ALERIS ROLLED PRODUCTS, INC., commonly known as ALERIS ROLLED PRODUCTS MANUFACTURING, INC., which merged with COMMONWEALTH ALUMINUM LEWISPORT, LLC<br><br>DEFENDANT | CASE NO.: <u>4:18-CV-113-JHM</u> |

\*   \*   \*   \*   \*

## COMPLAINT

Comes now, Plaintiff Advantage Industrial Systems, LLC ("AIS"), and for its Complaint against Defendant Aleris Rolled Products, Inc. (commonly known as Aleris Rolled Products Manufacturing, Inc. which merged with Commonwealth Aluminum Lewisport, LLC) ("Aleris"), states as follows:

### I.
### PARTIES

1.    AIS is an Illinois Limited Liability Company with its principle place of business located at 9320 Corsair Road, Frankfort, IL 60423.

2.    Aleris is a Delaware Corporation with its principal place of business located at 25825 Science Park Drive, Suite 400, Beachwood, OH 44122.

### II.
### JURISDICTION AND VENUE

3.     Jurisdiction and venue are proper under 28 U.S.C. §1332(a)(1) because: (i) the matter in controversy exceeds $75,000, exclusive of interest and costs; (ii) complete diversity of citizenship exists between Plaintiff and the Defendant; and (iii) some or all of the actions and/or inactions giving rise to the losses/damages at issue occurred within the District and Division over which this Court presides.

### III.
### COMMON ALLEGATIONS

**A.     Project Overview**

4.     AIS, as a contractor, entered into an agreement with Aleris, as the owner, whereby AIS was to erect structural steel and then install equipment for two (2) Continuous Annealing Lines with Pre-Treatment ("CALP") lines in connection with the expansion of the existing rolling mill plant located at 1372 State Route 1957, Hancock County, Lewisport, KY[1] ("Project") on real property owned by Aleris ("AIS Contract"). A copy of the AIS Contract is attached as **Exhibit A**.

5.     Prior to the time it entered into a contract with Aleris, Aleris formalized the employment of Ramon Mella, to head its onsite Project management. Mr. Mella, who had previously been working for Navistar as a Project Director, had prior experience in process management, but little or no prior construction experience.

6.     At the time Mr. Mella was hired, Andritz had already been designated by Aleris as a prime equipment supplier for the Project, which decision was made without the involvement of Aleris' onsite personnel, and negotiations were underway with CH2M Hill to provide project management, construction management, engineering, engineering integration and architectural services, which negotiations were concluded in December 2014.

7.     While negotiations were ongoing, Aleris was waiting for promised funding for the plant from General Motors ("GM") to be finalized in contract and materialize.

8.     It was anticipated that Andritz required an 18 month lead time from formal submission of a purchase order with payment to delivery of the equipment.

9.     At all times material hereto, Aleris had very little cash of its own and was going to be wholly dependent upon GM to fund the project.

---

[1] This address is also known as 1372 State Road 1957, Lewisport, Hancock County, Kentucky 43215.

10.     As the Project progressed, Aleris was forced to have engineering done in sections on the line, which made it challenging to garner bid contracts, as the specifications being bid were uncertain or incomplete.

11.     Aleris faced numerous challenges in regards to the Project, including procuring funding, complying with a hard completion deadline, proceeding to obtain bids and go to contract with incomplete and undetermined specifications.

12.     One of the most significant challenges was the difficulty in achieving milestones necessary to obtain the next of scheduled $40 million incremental funding disbursements from GM.

13.     Much, if not all, of the initial $40 million provided by GM was utilized by Aleris to purchase equipment, which ultimately was procured from suppliers in 17 countries.

14.     Throughout the Project, there were chronic funding shortfalls due to protracted delays by GM in providing the next funding increment. Notwithstanding the foregoing, GM pushed very hard for work to progress, insisting upon a fixed deadline for completion despite the fact that financing was at times 18 months out.

15.     Aleris accepted the Project and began work even before it had assembled a complete team to do the work.

16.     Aleris' Board would not agree to the Project without GM's funding in place. It would not, in other words, spend its own money on the Project.

17.     As the available funding ran out, Aleris encountered changes in conditions that it had not anticipated at the time it negotiated the funding formula and corresponding performance milestones.

18.     Aleris demonstrated a lack of understanding of the basics of construction management, *i.e.,* that concrete comes before steel, that civil engineering comes before concrete, etc.

19.     Bid documents were sent out without having been submitted to prior review and approval by the construction team. In many instances, the information contained in the bid solicitations was incorrect, incomplete or unworkable.

20.     Aleris did not have the benefit of engineering work provided by its suppliers.

21.     Aleris was pumping steel suppliers for delivery dates based upon bad or unworkable deadlines.

22.     Basic construction assumptions were made without any foundation in fact or the reality of existing conditions, resulting in a significant adverse impact upon both the Project schedule and the Project budget.

23.     The lack of adequate planning and on-the-fly engineering presented real challenges and hardships for subcontractors, particularly AIS. Aleris never disclosed any of the foregoing difficulties to AIS; to the contrary Aleris took great pains to conceal the extraordinary difficulties it was having on the Project, including, without limitation, chronic funding shortfalls, inadequate inhouse staff and resources with which to complete the job and significant disparities between the representations it was making to AIS and others and actual conditions.

24.     Aleris undertook desperate measures to conceal the true extent of its disorder and chaos from AIS, often times making knowingly false representations to induce performance. These measures became so egregious as to constitute institutional dishonesty.

25.     Among instances of the foregoing were written assurances and representations that were later reneged on; stark denials of events and conditions which were in fact real and in existence; treating contractors and employees as dispensable, if not disposable; placing a $60,000 cap on employee compensation, ensuring that those hired had little or no experience; and making numerous representations of ongoing employment and forthcoming compensation packages knowing that neither would be forthcoming.

26.     Among the misrepresentations Aleris made to AIS was that Andritz was to provide an offsite but accessible warehouse into which equipment would be pre-shipped and stored to be easily transported to the site in good order and condition. This was not done, although Aleris never informed AIS that it was not going to be done, despite having knowledge of that fact.

27.     Equipment was continually shipped out of sequence by Andritz, Otto Junker and others, and often out of order, with shipments arriving in unlabeled or mislabeled containers through which AIS was forced to continually search to locate the equipment or materials it need to proceed with its work.

28.     Worse, shipments would arrive that were incomplete, requiring AIS to expend considerable time and resources attempting to locate all of the necessary components, only to discover they had not all arrived.

-4-

29.     Perhaps the most dishonest conduct engaged in by Aleris was with respect to the Change Order procedure Aleris pursued on the project.

30.     Aleris represented to AIS that the signature of Ramon Mella constituted approval and acceptance of a change order.

31.     Aleris knew that AIS would proceed to do work encompassed by the change order in reliance that said change order had been approved.

32.     Unbeknownst to AIS and the other subcontractors, Aleris maintained a second, concealed level of approval of change orders.

33.     In fact, Mr. Mella's signature was conclusive of nothing. Change orders signed by Mr. Mella were subsequently reviewed by an Executive Committee headed by one Andrew Ishmael. The decisions of this Executive Committee were made heedless to whether or not Mr. Mella had approved the work, heedless of AIS' reliance upon the signed Change Order and heedless to the merits of the Change Order Request. It was not unusual for the Executive Committee to disapprove a Change Order signed by Mr. Mella after the work had been performed by AIS. In more notorious instances, Change Orders would be denied or repudiated not only after the work had been done by AIS, but said work had been approved by Aleris and, in several instances, additional such work ordered.

34.     Worse, even the approval of the Executive Committee was not an assurance of payment, as these recommendations then had to be forwarded to Aleris' Board for approval and funding. This approval as well took place heedless to any prior approvals, whether or not the work had been performed, and with disregard for the subcontractor's reliance upon a signed, approved change order.

35.     Aleris had no approval ever from its Board to increase the construction budget, meaning that Mr. Mella's approval of change orders took place despite the fact that Mr. Mella and Aleris knew they had no additional funding with which to pay for the work.

36.     The situation became so bad that Mr. Mella became concerned about subcontractors walking off the project as change orders were repudiated after the work had been approved and performed.

37.     Completion dates and interim milestones were not being revised and updated, even as Aleris had actual knowledge that the dates it was publishing were impossible to comply with. Eventually Aleris ceased all scheduling meetings, leaving in place work deadlines it knew

1182647:13

to be impossible given existing conditions. For example, the original completion date for the erection of structural steel on CALP 2 had expired prior to any such steel being delivered to the site.

38.     With respect to CH2M Hill, once civil engineering and architecture were done, CH2M Hill pulled out its civil engineers and architect, as Aleris decided to proceed in their absence in order to "save money". Neither were ever replaced.

39.     Construction Management was no longer performed by CH2M Hill. Unperformed engineering and engineering integration had to be done in order for the Project to proceed while Aleris replaced CH2M Hill's experienced construction engineers and other Project personnel with newly-hired kids fresh out of school looking for positions and lacking any meaningful experience. Extra costs imposed upon CH2M Hill to maintain the Project's operational capacity while the transition took place resulted in CH2M Hill requesting an additional payment of approximately $8 million.

40.     Aleris elected to invoke cost-cutting measures by moving the engineering duties to be performed to Aleris' in-house engineers, despite the fact that Aleris' engineers were not qualified to perform the tasks with which they were being charged, *i.e.,* to complete the engineering work originally to be performed by CH2M Hill. In most instances, the engineering personnel recruited by Aleris were fresh out of school and lacked any construction experience.

41.     Under the circumstances, CH2M Hill reduced its onsite presence to skeletal dimensions and ultimately pulled out of the Project altogether.

42.     AIS is of the reasonable information and belief, and therefore avers, that a number of difficulties arose with respect to the Aleris-Andritz contract which impacted Aleris' conduct on the Project, as anticipated funding was habitually late, much of the work required advance notice and Andritz, knowing of Aleris' ongoing funding difficulties, would not commence work without cash in hand.

43.     For reasons not entirely clear to AIS, Cives, the chief steel supplier during the CALP 1 phase of the Project, did not participate in CALP 2, requiring Aleris to scramble to find an alternative steel supplier even as AIS was awaiting the delivery of steel onsite to erect, and was being promised the imminent arrival of steel. Importantly, Aleris never disclosed this fact to AIS, but instead continued to make knowingly false representations as to when structural steel

would be delivered, many of which were made prior to Aleris even having a contract in place with an alternative steel supplier.

44.     Aleris adopted a Project-wide pattern and practice of deceit in order to keep work progressing, often offering partial compensation for change order work just to keep a subcontractor from walking off. For example, a subcontractor would be offered half of what even Aleris calculated work would cost, just to keep work going. If Aleris was not worried about a particular subcontractor walking off, it would reject meritorious change orders out of hand or, where necessary, approve them, ensure the work was performed, and then repudiate them after the fact and deny payment.

45.     Mr. Mella and Aleris senior management were specifically instructed to conceal from the subcontractors for as long as possible the fact that a particular change order had been subsequently disapproved or repudiated after approval. The thought was that if the subcontractor knew what was happening, it would slow down the work. At all times material hereto, AIS was among the subcontractors so victimized.

46.     Much of the pressure on Aleris relating to this Project was attributable to GM, which, upon information and belief, had discovered that its chief competitor, Ford, was utilizing significant amounts of aluminum in its F 150 pick-up, the largest selling vehicle in North America.

47.     In response to this discovery, GM launched a program to expand its capacity to procure aluminum to incorporate into its Chevrolet Silverado and GMC Sierra pick-ups, the second largest selling vehicle in North America.

48.     Thus, GM launched a hurried effort to develop its own capacity to incorporate aluminum into its trucks.

49.     All parties connected with the Aleris Project were told to maintain strict confidentiality. Nonetheless, word leaked out as suppliers and others talked among themselves.

50.     The hurried nature of GM's efforts, the enormous amount of cash required to fund the Project, the time it took for GM to procure financing, protracted delays in GM's subsequent funding tranches, serious mistakes Aleris made in negotiating the interim payment and corresponding performance milestones with its funding source and shortsighted and counterproductive "cost-cutting" measures which left the Project bereft of experienced project

management and constituent engineering and architectural resources are the prime drivers for the misconduct in which Aleris engaged in the course of this Project.

51.     Moreover, the culture of secrecy initially due to GM's desire to keep its efforts under wraps as long as possible ultimately infected Aleris' dealings with its subs, in which concealment, deceit and outright falsehoods were increasingly employed to keep work progressing despite chronic funding shortfalls and their ripple effect through all of the succeeding work.

52.     In sum, the tactics employed by Aleris constituted horrific abuse of subcontractors and resulted in one of the most ineptly-administered construction Projects ever witnessed.

**B.     Base Contract Amount and AIS Lien**

53.     Where Aleris did not prevent AIS's performance, AIS performed all of its contractual obligations pursuant to the AIS Contract.

54.     All labor, materials, and equipment furnished by AIS were of good quality and provided, where possible, in accordance with the AIS Contract.

55.     Despite repeated demands, and numerous assurances, Aleris failed and refused, without justification, to pay AIS **$1,518,610.79** of the original AIS Contract amount invoiced for work performed on the Project ("Base Contract Amount").

56.     On June 27, 2017, AIS filed with the Hancock County Clerk, a Mechanic's and Materialman's Lien Statement for the Construction of Improvements on Real Estate located in Hancock County, Kentucky under KRS 376.010 et seq., at Mechanic's Lien Book 4 Pages 474-504 in the amount of **$1,518,610.79**, plus interest, filing fees, and costs expended in enforcing the AIS Lien, for the Base Contract Amount ("AIS Lien").

**C.     Delays, Disruptions, Inefficiencies and Additional Work**

57.     Aleris and those under Aleris's control, exclusive of AIS, caused significant delays, disruptions, inefficiencies, and additional work to AIS's work on the Project.

58.     The delays, disruptions, inefficiencies, and additional work were due to circumstances beyond AIS's control and under the responsibility and control of Aleris.  Such circumstances were unreasonable, not within the contemplation of the parties, and constituted active interference by Aleris.

59.     Examples of such delays, inefficiencies, impacts, and disruptions are described below.

1.      **Failure to Provide the Architect's Duties Under the AIS Contract**

60.     The AIS Contract designated CH2M Hill Engineers, Inc. ("CH2M Hill") as the Architect of record for the Project.

61.     A201 Article 4.1.1 of the AIS Contract provided in part that the "Owner shall retain an architect lawfully licensed to practice architecture or an entity lawfully practicing architecture in the jurisdiction where the Project is located."

62.     A201 Article 4.1.2 of the AIS Contract provided in part that "[d]uties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect."

63.     A201 Article 4.1.3 of the AIS Contract provided in part "[i]f the employment of the Architect is terminated, the Owner shall employ a successor architect."

64.     Aleris, shortly after AIS commenced work on the Project, without AIS's written consent, substantially reduced the scope of CH2M Hill's duties and responsibilities required by the AIS Contract without any notice to AIS.  Said reduction included the removal or elimination of key CH2M Hill management personnel onsite to prepare, supervise, coordinate and administer work on the project, the absence of which led to widespread chaos on the site and in the work.

65.     For example, the Architect's duties under the AIS Contract included, but were not limited to: administration of the AIS Contract, serving as the Owner's representative during construction until final payment to AIS was due, reviewing and approving AIS's submittals, preparing change orders and construction change directives, reviewing and responding to Requests for Information ("RFI") concerning the Contract Documents.

66.     Aleris failed to employ a successor Architect to fulfill the duties and responsibilities required by the AIS Contract.

67.     Aleris's failure to provide an Architect to conduct the Architect's duties and responsibilities caused substantial delays due to a chaotic and uncontrolled Project where basic questions regarding the intent of the design drawings, errors in the drawings, and omissions in the design drawings were not timely answered.

68.     Notably, pursuant to the AIS Contract Exhibit A, AIS's RFIs were to be answered within 48 hours.

69.     AIS's RFIs were not answered within 48 hours, further delaying AIS's work on

the Project.

**2.      Design Errors and Omissions**

70.      Aleris was required to provide design drawings that were suitable for AIS's use on the Project.

71.      AIS was entitled to rely upon the suitability, adequacy, and building code conformance of the design provided by Aleris.

72.      Upon information and belief, the structural steel design drawings and the equipment design drawings were not complete, not properly coordinated, and contained numerous errors and omissions, all of which delayed AIS's work.

73.      Upon information and belief, the structural steel design drawings had to be revised in order to accommodate equipment loads, which delayed AIS's work.

74.      Upon information and belief, the original Issued for Construction structural steel design drawings did not include structural steel known as the 4000 level steel, which would ultimately need to be erected by AIS.

75.      The 4000 level steel design omission delayed the setting of equipment below the 4000 level, impacting, *inter alia,* the installation of equipment, including coil openers 1 and 2; outboard bearings 1 and 2; drive pinch rolls 1, 2, 3 and 6; drive flatteners 1 and 2; center position controls 1 and 2; strip thickness gauges 1 and 2; scrap belt conveyor 2; and swiveling table 2 and bridle roll

**3.      Aleris's Failure to Provide Necessary Project Management and Equipment Information**

76.      The AIS Contract required Aleris to furnish information or services required in the Contract Documents with reasonable promptness.

77.      The AIS Contract required Aleris to furnish any other information or services under the Owner's control and relevant to the Contractor's performance of the Work with reasonable promptness after receiving the Contractor's written request for such information or services.

78.      AIS's work was delayed by Aleris's failure to timely furnish information, including but not limited to, information concerning errors and omissions in the design drawings, change orders, delays caused by predecessor work, schedule changes, equipment packaging and deliveries, and responses to requests for information.

-10-

79.    For example, during the Installation and Planning for CALP 1 and CALP 2 Meeting on October 13-15, 2015, it was agreed that each crate of equipment would have a unique number and a packing list.

80.    Aleris failed to label each crate and provide accurate packing lists, which resulted in AIS's incurring additional unplanned costs (1) opening multiple crates to search for all components of a piece of equipment and (2) constantly moving crates to find the required equipment components.

81.    AIS was delayed by Aleris's failure to provide persons or entities with substantial construction experience to manage the work in an orderly and efficient manner.

82.    AIS was delayed as Aleris could not provide timely responses to discovered design errors and omissions.

**4.    Lack of Proper Foundations Delayed Steel Erection**

83.    Aleris's completion of proper concrete foundations was necessary for AIS to commence unloading structural steel (provided by Aleris), erecting structural steel, and then installing equipment.

84.    Exhibit A of the AIS Contract provides that AIS was to commence mobilization in mid-October 2015.

85.    AIS attended an Installation Planning for CALP 1 and CALP 2 Meeting at the site October 13-15, 2015.

86.    AIS mobilized to the Project in October 2015.

87.    Under the AIS Contract Exhibit B, the foundations for Sections 1 through 4 of CALP 1 ("Foundations") were scheduled to be complete November 19, 2015.  The Foundations were not complete by November 19, 2015.

88.    In addition, the Exit Area (Section 1 & 4) Foundation had to be removed and replaced.

89.    Upon information and belief, the Exit Area (Section 1 & 4) Foundation re-work was due to the incorrect design and/or placement of rebar in the concrete.

90.    Aleris's failure to complete proper concrete foundations in accordance with the AIS Contract delayed AIS's work.

**5.    Lack of Adequate Storage and Laydown Areas**

91.    Exhibit A of the AIS Contract provided that AIS would utilize the designated

-11-

storage and laydown areas on the north end of the building for staging and assembly.

92.     Aleris failed to provide the designated storage and laydown areas.

93.     AIS was forced to use additional labor resources to laydown the structural steel on dirt and move the steel multiple times to facilitate ongoing foundation work.

**6.     Alteration of AIS's Planned Sequence of Erection and Equipment Setting**

94.     Exhibit B of the AIS Contract provided that steel erection would begin in Sections 1 and 2 of CALP 1 on November 19, 2015.

95.     AIS mobilized to the site as required by the AIS Contract.

96.     The foundations for Sections 1 and 2 of CALP 1 were not complete on November 19, 2015.

97.     AIS was prevented from erecting any structural steel in Sections 1 and 2 of CALP 1 starting November 19, 2015, delaying AIS's work.

98.     AIS was forced to demobilize from the Project at an additional cost until the foundations were complete.

99.     As foundations were completed, Aleris directed AIS to conduct multiple demobilizations and remobilizations out of AIS's planned sequence of erection of structural steel and equipment setting.

100.     Examples of such demobilizations and remobilizations include, but are not limited to: A.     Aleris altered the planned sequence of steel erection when it directed AIS to demobilize from the Exit Area (Section 1 and 4) and remobilize to the Pickling Area. B.   Aleris altered the planned sequence of steel erection when it directed AIS to demobilize from the Pickling Area and move back to the Exit Area (Section 1 and 4). C.Aleris   altered   the   planned sequence of steel erection when it directed AIS to demobilize from the Exit Area (Section 1 and 4) and remobilize to the Entry Area (Section 24).D. Aleris altered the planned sequence of steel erection when it directed AIS to demobilize from the Entry Area (Section 24) and remobilize to the Exit Area (Section 1 and 4).

101.     AIS followed Aleris's demobilization and remobilization directives causing AIS to incur additional costs, delays, and inefficiencies.

#### 7.     **Inability to Determine Centerline**

102.     In order for AIS to begin the installation of equipment, it was necessary for AIS to have a line of sight between the structural steel columns that were erected in order to establish a Centerline down the middle of the columns such that equipment was placed on the Centerline to ensure the vertical alignment of all equipment.

103.     After the steel was erected, Aleris determined that it needed to coat the flooring, which resulted in the installation of containment barriers which resulted in the obstruction of the line of sight, and, therefore, delayed a survey to establish the Centerline which was necessary for AIS to install equipment.

104.     In addition, Aleris's failure to complete the elevated foundations for the Tension Leveler and Edge Trimmer, further delayed the establishment of the Centerline, and, therefore, further delayed AIS's work.

#### 8.     **Late Equipment Deliveries**

105.     The AIS Contract provided dates on which equipment was to be delivered to the Project in order for AIS to install such equipment.

106.     Aleris failed to timely deliver the equipment in accordance with the AIS Contract, thereby delaying AIS's work.

107.     The late delivery of equipment included but is not limited to:  strip position control; looper exit rails; looper car; dolly car; car return winch; strip position control; deflector roll 6, 6a and 6b; frame for online surface inspection; steering roll 10 and 11; anti-flutter rolls; edge trimmer; edge scrap drum shear; edge scrap conveyor; edge scrap box; strip width measurement; inspection stand; inspection stand lights; drive bridle 13 and strip marking device.

#### 9.     **Equipment Assembly**

108.     AIS's scope of work did not include equipment assembly.

109.     AIS was directed to assemble certain pieces of equipment outside of its scope of work.

110.     For example, the motors and pumps for the Pickling and Degreasing Areas arrived in an unassembled and mismatched condition, requiring AIS to conduct additional out-of-scope assembly work.

#### 10.     **Steel Delivery Delays on CALP 2**

111.     Upon information and belief, Aleris contracted with Cives Steel Co. ("Cives") in order to fabricate the structural steel for CALP 1 and CALP 2.

112.     Cives fabricated and delivered the structural steel for CALP 1.

113.     Upon information and belief, the agreement between Cives and Aleris was terminated prior to work scheduled to commence on CALP 2.

114.     Upon information and belief, Aleris delayed the project as it had to solicit and retain a new structural steel fabricator.

115.     Aleris then contracted with Covenant Steel Warehouse, Inc. ("Covenant") to complete CALP 2.

116.     According to Exhibit A of the AIS Contract, AIS was scheduled to commence erection of the structural steel on CALP 2 on March 2, 2016.

117.     Upon information and belief, Aleris did not enter into a contract with Covenant to provide structural steel until after March 2, 2016.

118.     According to Exhibit A of the AIS Contract, AIS was scheduled to substantially complete erection of the structural steel and installation of the equipment on CALP 2 on October 7, 2016.

119.     Aleris delayed AIS's work as Aleris did not begin to deliver the structural steel for CALP 2 until August 6, 2016.

120.     Aleris delayed AIS's work as Aleris did not complete delivery of all structural steel for CALP 2 until January 2017.

    11.   **Damages Caused by Aleris's Delays, Disruptions, Inefficiencies, and Additional Work**

121.     Aleris's failures to follow the AIS Contract, as demonstrated above, caused AIS to incur damages which include, but are not limited to, labor and material costs arising from substantial additional work, delays, disruptions, and inefficiencies.

122.     As a direct and proximate result of Aleris's delays, disruptions, inefficiencies, and additional work, AIS was forced to:

    A.     spend additional months on the Project, which exceeded the duration set forth in the Contract, causing AIS to expend substantial additional monies to perform its work on the Project including, but not limited to, additional overhead and general conditions.

-14-

B.      expend substantial additional monies to perform additional work on the Project, including, but not limited to, additional labor costs and extended general conditions.

C.      work overtime and perform additional tasks not included within its scope of work under the Contract in an effort to complete the Project on schedule.

D.      incur additional labor costs due to mobilization and remobilization that was not included in the scope of the Contract.

E.      perform its work in an inefficient manner, thereby increasing its labor costs.

123.    As a direct and proximate result of Aleris's delays, disruptions, and interference, Aleris is required to pay AIS for AIS's additional labor costs, labor inefficiencies, extended general conditions, and any other damages as a result of Aleris's delays, disruptions, and interference on the Project ("Impact Costs").

124.    Aleris has failed and refused, without justification, to pay AIS for such Impact Costs.

**D.      Total Claim and Procedural History**

125.    There is presently due and owing to AIS an amount of at least $1,518,610.79, plus interest, fees, and costs for the Base Contract Amount, in addition to Impact Costs, all of which are in excess of the jurisdictional requirements of this Court.

126.    Payment to AIS has been unreasonably withheld and was not paid in accordance with the AIS Contract and the Kentucky Fairness in Construction Act.

127.    AIS presented its claims to Aleris for delays, disruptions, inefficiencies, and additional work throughout the Project.

128.    After AIS completed CALP 1, AIS presented a claim on CALP 1 to Aleris for delays, inefficiencies, and impacts.

129.    After AIS completed CALP 1, AIS requested that Aleris engage in informal settlement negotiations on claims presented as of November 2016.  Informal settlement negotiations took place, followed by protracted periods of time during which Aleris was unresponsive and/or unavailable, and ultimately the negotiations were not successful.

1182647:13

130.     AIS continued work on CALP 2 despite the significant outstanding claims on CALP 1, in reliance upon Aleris's representations that settlement negotiations would resume in order to resolve both AIS's CALP 1 and CALP 2 claims.

131.     Shortly before AIS completed CALP 2, AIS requested that Aleris resume informal settlement negotiations on all claims presented after the completion of CALP 2. Informal settlement negotiations took place in much the same manner as previously, with negotiating sessions followed by protracted periods of Aleris's silence and/or unavailability. While progress appeared to have been made, the negotiations were not successful as Aleris failed to timely respond to AIS's inquiries regarding further action.

132.     AIS demanded mediation in March 2017, however Aleris claimed that it was unavailable for mediation until August 2, 2017.

133.     AIS and Aleris agreed upon a mutual exchange of position statements in July 2017.  In July 2017, the parties exchanged mediation statements, and subsequently the principals of Aleris and AIS resumed settlement discussions.

134.     During the July 2017 settlement discussions, Aleris led AIS to believe that they could resolve the dispute through informal settlement negotiations and convinced AIS to postpone the mediation just a few days prior to mediation.

135.     As soon as the mediation was postponed, in August 2017, Aleris became inexplicably hostile toward settlement and abruptly halted all good faith settlement negotiations. It became apparent that Aleris misrepresented its intentions to negotiate in good faith, and that the postponement was simply another delay tactic.

136.     Aleris's refusal to engage in good faith settlement negotiations made settlement impossible and mediation a time-consuming act of futility.

137.     As a result of Aleris's hostility toward settlement, its refusal to make any good faith settlement offers, together with an express representation that no settlement offer would be forthcoming, AIS was excused from further compliance with the condition precedent, requiring mediation before filing this litigation.

138.     Any mediation of this matter would be futile given Aleris's refusal to pay anything in a dispute involving millions of dollars and months of delay due to Aleris.

-16-

139.     AIS has incurred substantial additional costs on the Project dating back to 2015, and Aleris has failed to make a good faith attempt to evaluate and resolve AIS's claims for payment.

140.     Aleris has abused the mediation process and informal settlement negotiations by using the process as a means to delay payment to AIS.

**COUNT I**

**<u>BREACH OF CONTRACT BY ALERIS</u>**

141.     AIS realleges and incorporates by reference the allegations contained in Paragraphs 1 through 140 above as though fully set forth herein.

142.     During the construction of the Project, Aleris repeatedly and materially breached the Contract.  Such material breaches of the Contract include, but are not limited to, the following:

    A.     Aleris failed and refused to pay AIS the balance due under the AIS Contract;

    B.     Aleris failed and refused to make timely payments to AIS in accordance with the AIS Contract and the Kentucky Fairness in Construction Act;

    C.     Aleris failed and refused to issue and pay for proper Change Orders as required by the AIS Contract;

    D.     Aleris and those under Aleris's control, exclusive of AIS, caused significant delays, disruptions, inefficiencies, and additional work to AIS's work on the Project;

    E.     Aleris failed to employ a successor Architect to fulfill the duties and responsibilities required by the AIS Contract;

    F.     Aleris failed to provide proper and timely foundations;

    G.     Aleris failed to provide adequate storage and laydown areas;

    H.     Aleris altered AIS's planned sequence of erection and equipment setting;

    I.     Aleris provided Contract Documents with design errors and omissions;

    J.     Aleris's work prohibited the determination of the centerline;

    K.     Aleris did not deliver equipment in accordance with the AIS Contract;

    L.     Aleris failed to provide necessary project management and equipment information;

-17-

      M.     Aleris failed to deliver assembled equipment; and

      N.     Aleris failed to deliver steel in accordance with the AIS Contract.

143.     The multiple breaches of the AIS Contract by Aleris, as set forth herein, damaged AIS in the amount of at least $1,518,610.79, plus Impact Costs, in excess of the jurisdictional requirements of this Court, plus attorneys' fees, costs, and pre- and post-judgment interest.

**COUNT II**

**VIOLATION OF KENTUCKY FAIRNESS IN CONSTRUCTION ACT**

144.     AIS realleges and incorporates by reference the allegations contained in Paragraphs 1 through 143 above as though fully set forth herein.

145.     Aleris failed to make timely payments in accordance with the AIS Contract and the Kentucky Fairness in Construction Act ("Act").

146.     AIS properly submitted Applications for Payment.

147.     Aleris failed to make payments *in full* to AIS in accordance with the Applications for Payment as required by the AIS Contract and in accordance with KRS 371.405 et seq.

148.     Aleris wrongfully withheld portions of AIS's progress payments without cause.

149.     Aleris's failure to make timely *and complete* progress payments in accordance with the AIS Contract and the Act entitles AIS to interest at a rate of 12% per annum, beginning the first date after payment was due.

150.     Aleris failed to release retainage in accordance with KRS 371.410 without cause. AIS is of the reasonable information and belief, and therefore avers, that Aleris paid for some or all of that portion of the change work actually funded with moneys from AIS' retainage, leaving Aleris without Project construction funds with which to pay for all Work.

151.     Aleris has acted in bad faith in refusing to make progress payments and release retainage without cause as required by the Act and the Contract, and, therefore, pursuant to KRS 371.415, AIS is entitled to its attorneys' fees and costs incurred in the collection of the amounts owed.

152.     The multiple breaches of the Contract by Aleris, as set forth herein, damaged AIS in the amount of at least $1,518,610.79, plus Impact Costs in excess of the jurisdictional requirements of this Court, plus interest at a rate of 12% per annum and attorneys' fees.

## COUNT III

## <u>QUANTUM MERUIT/UNJUST ENRICHMENT</u>

153.    AIS realleges and incorporates by reference the allegations contained in Paragraphs 1 through 152 above as though fully set forth herein.

154.    Aleris directed AIS to perform additional work and/or change orders that were outside the scope and not part of the Aleris Contract.

155.    Aleris failed and/or refused to pay AIS for the additional work and/or change orders.

156.    Aleris has received a benefit from the additional work and/or changes orders that AIS performed that it would be unjust for Aleris to keep.

157.    As a direct and proximate result, AIS has been damaged in an amount in excess of the jurisdictional limits of $75,000.00.

## <u>DEMAND FOR RELIEF</u>

WHEREFORE, Advantage Industrial Systems, LLC prays that this Court enter judgment in its favor against the Defendants, including, without limitation:

158.    Judgment against Aleris, for the sum of:

A.    an amount not less than the Base Contract Amount of $1,518,610.79;

B.    Impact Costs in excess of the jurisdictional requirements of this Court;

C.    interest at a rate of 12% per annum in accordance with KRS 371.405 et seq.;

D.    attorneys' fees and costs in accordance with KRS 371.415;

E.    its costs of collection, including court costs and reasonable attorneys' fees through date of judgment;

F.    Pre and post-judgment interest on the entire sums adjudged due; and

G.    Such other relief as the Court, in the reasonable exercise of its sound discretion, deems just and proper.

Plaintiff demands trial by jury on all issues so triable.

SULLIVAN MOUNTJOY, PSC

/s/ R. Michael Sullivan
R. Michael Sullivan, Esq., Ky. Bar No. 84039
100 St. Ann Street
Owensboro, KY 42303
Telephone:  (270) 926-4000
Facsimile: (270) 683-6694
msullivan@smlegal.com

*Counsel for Plaintiff*

Anthony E. Patterson, Esq.
Pa. I.D. No. 72881
304 Ross Street, Suite 505
Pittsburgh, PA  15219
Telephone (412) 281-2704
Facsimile (412) 586-5271
Aeplawfirm@aol.com

*Co-Counsel for Plaintiff (PRO HAC VICE MOTION
PENDING)*

-20-