UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:18-CV-00113-JHM-HBB

**ADVANTAGE INDUSTIAL SYSTEMS, LLC,**                  **PLAINTIFF**

**VS.**

**ALERIS ROLLED PRODUCTS, INC.,**
Commonly known as **ALERIS ROLLED**
**PRODUCTS MANUFACTURING, INC., which**
merged with **COMMONWEALTH ALUMINUM,**            **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion to compel filed by Plaintiff Advantage Industrial Systems, LLC (AIS) (DN 30). Defendant Aleris Rolled Products, Inc. (Aleris) responded with a memorandum in opposition, an exhibit, and affidavit (DN 33). AIS replied with a memorandum (DN 34) and four exhibits (DN 40 SEALED). By leave of Court (DN 38, 39), AIS filed four exhibits under seal (DN 40) and both parties filed supplemental memoranda discussing the exhibits (DN 41 SEALED, DN 42 SEALED). For the reasons set forth below, AIS's motion to compel is **GRANTED** in part and **DENIED** in part.

### Background

AIS entered into a written AIA contract (Contract) with Aleris to erect structural steel and install equipment for two continuous annealing lines with pre-treatment (CALP 1 and 2) lines at Aleris's rolling mill in Lewisport, Kentucky (DN 1 PageID # 2 Complaint; DN 1-2 Exhibit A – AIA Contract). AIS alleges it performed the work in connection with a $350 million project to convert Aleris's Lewisport Rolling Mill into a state-of-the-art facility with improved rolled

aluminum fabrication capabilities for use among various industries including, sheet plate and fabricated products for the automotive, building and construction, and transportation and consumer durable goods industries (DN 1 PageID # 2-8; DN 30 PageID # 540-41; DN 33 PageID # 556). Aleris asserts the Project cost more than $600 million (DN 33-2 PageID # 573 ¶ 10 Declaration of Eric M. Rychel).

The Complaint alleges that Aleris failed to pay AIS for base contract work and additional costs arising from extra work, delays, disruptions, and inefficiencies on the Project (DN 1 PageID # 2-17). Count I in the Complaint asserts a breach of contract claim; Count II raises a claim under the Kentucky Fairness in Construction Act; and Count III presents a quantum meruit/unjust enrichment claim (Id. PageID # 17-19). AIS seeks a monetary damage award of an amount not less than the base contract amount of $1,518,610.79; impact costs; interest in accordance with KRS 371.405 et seq.; attorney fees in accordance with KRS 371.415; collection costs; pre and post judgment interest; and other relief the Court deems appropriate (Id. PageID # 19).

Aleris responded to the Complaint with an Answer asserting seventeen defenses and two counterclaims (DN 18 PageID # 199-213). Count I of the counterclaims alleges that AIS committed numerous material breaches of the Contract which have damaged Aleris in an amount equal to or greater than $4,900,000.00 (Id. PageID # 206-11). Count II asserts a claim of unjust enrichment/quantum meruit that is pled in the alternative to Count I (Id. PageID # 211-13). AIS responded to Aleris's counterclaims with an Answer asserting ten defenses (DN 19).

This discovery dispute arises out of written discovery AIS propounded to Aleris (DN 30). Specifically, AIS's second request for production of documents asked Aleris to:

1. Produce any and all agreements and/or contracts relating and/or pertaining to the funding of the Project and/or Aleris' investment in the Project, including without limitation funding agreements and/or loan agreements between Aleris and General Motors.

2. Produce any and all Documents and/or Communications that relate and/or pertain to the agreements and/or contracts identified and/or produced in Request No. 1, including without limitation Documents or Communications that relate and/or pertain to the negotiation, drafting, performance, breach, expiration and/or termination of the agreements and/or contracts.

(DN 30 PageID # 543). Initially, Aleris objected to Request Nos. 1 and 2 on the grounds they are overbroad and implicate documents that are not relevant to the claims or defenses of the parties and are not proportional to the needs of the case (Id. PageID # 543-44). Aleris subsequently changed its position and agreed to produce certain documents it viewed as responsive to Request Nos. 1 and 2 (Id. PageID # 544). This discovery dispute concerns the fulsomeness of Aleris's responses to AIS's written discovery.

## AIS' Motion to Compel

AIS contends that Aleris has failed to produce all documents sought in Request Nos. 1 and 2 (DN 30 PageID # 544). AIS argues these requests go to the crux of whether Aleris had the funds necessary to pay the Project expenses, which is crucial to AIS' claims in the complaint and the defenses it raises to Aleris's breach of contract counterclaim (Id. PageID # 542-46). AIS asserts that Aleris did not have the money to fund the $350 million project which led to delays, inefficiencies and AIS not getting paid by Aleris (Id.). For this reason, Aleris should be compelled to more fully respond to Request Nos. 1 and 2 which seek documents and communications concerning the sources of and circumstances surrounding the funding of the Project (Id.).

## Aleris' Response

Aleris acknowledges AIS's argument but contends that such material is not reasonably calculated to lead to the discovery of admissible evidence because a party's reason or motivation

for the breach is not relevant to a breach of contract claim (DN 33 PageID # 559-61).[1] Aleris also contends that information regarding its ability to pay a judgment against it is not discoverable until after AIS is successful on the merits (Id.).

Next, Aleris contends that it has complied in good faith with all reasonable portions of Request Nos. 1 and 2 (Id. PageID # 561-62). Aleris explains that it and non-party GM have produced to AIS all the project related agreements between Aleris and GM, even though such agreements involve reserving capacity on the new lines and the supply of aluminum once the lines were operational[2] (Id.). From these contracts, AIS can see the amounts of the capacity reservation payments and when they were due and owing, and the circumstances where the agreements could be terminated[3] (Id.). Aleris also points out that it is required to make certain public filings with the United States Securities and Exchange Commission (SEC) because Aleris has public debt (Id.). Aleris suggests that AIS review these public filings about Aleris' financial health, liquidity, indebtedness and material transactions, because they will debunk AIS' theory that Aleris' funding ran out for the Project[4] (Id.). Further, Eric Rychel's declaration indicates that Aleris funded the

---

[1] In support of this argument Aleris cites the following cases, Coker v. McFaul, 247 Fed. Appx. 609, 617 (6th Cir. 2007); HM Compounding Services, LLC v. Express Scripts, Inc., 349 F. Supp. 3d 794, 804 (E.D. Mo. 2018); Mid Am. Sols. LLC v. Vantiv, Inc., 1:16-MC-2, 2016 WL 1611381, at *9 (S.D. Ohio Apr. 20, 2016); and Shathaia v. Travelers Cas. Ins. Co. of Am., 984 F. Supp. 2d 714, 722 (E.D. Mich. 2013); Human Services Consultants, Ltd. v. Tamule, CV 06-0486ML, 2008 WL 11390850, at *9 (D.R.I. June 30, 2008); McDougal v. Altec Indus., Inc., 553 F. Supp. 2d 862, 871 (W.D. Ky. 2008).

[2] Specifically, a "Capacity Reservation Agreement" by which GM reserved capacity on Aleris's new aluminum rolling lines once they are completed; and a related "Aluminum Supply Agreement" that contained the commercial terms, including pricing for the supply and purchase of aluminum from the new aluminum rolling lines once completed (DN 33 PageID # 558). Aleris points out that both agreements are highly confidential and were produced with the "Attorney's Eyes Only" designation (Id. PageID # 558 n. 1). Aleris contends that GM's production of documents to AIS also included correspondence between GM and Aleris about these two agreements and copies of invoices between Aleris and its suppliers and contractors on the Project (Id. PageID # 558-59).

[3] Additionally, in a September 23, 2019 letter to AIS, Aleris indicated that no funding agreements exist (Id. citing DN 33-1 Exhibit A).

[4] Aleris contends that all of the information given to or publicly available to AIS demonstrates that: (a) there was no funding agreement for the Project; (b) Aleris had enough funds on hand and available to pay its invoices; (c) the payments from GM to Aleris under the Capacity Reservation Agreement were only payable following completion of major milestones and were a very small portion of Aleris' overall spend for the project; and (d) several of the payments were only due and owing toward the end of the Project and were contingent on certain events (DN 33 PageID # 562).

Project through cash on hand and from monies borrowed under its revolving credit line; Aleris did not have a "funding shortfall" on the Project; and Aleris did not pay the alleged amounts that AIS is claiming in this lawsuit because Aleris believed they were not due[5] (DN 33 PageID # 559; DN 33-2 PageID # 571-72 Exhibit B Rychel Affidavit).

Aleris contends the only portion left of Request Nos. 1 and 2 would be documents pertaining to Aleris' investment in the Project as asked for in Request No. 1 (DN 33 PageID # 562-63). Aleris argues that portion of Request No. 1 is disproportionate, overbroad, unreasonable, vexatious, harassing, and unduly burdensome for Aleris to sift through thousands of invoices and hundreds and thousands of pages of internal documents, including highly confidential and proprietary financial and accounting records, meeting minutes, and banking information, demonstrating how it paid for all of the invoices transmitted on the approximately $600 million Project (DN 33 PageID # 562-63; DN 33-2 PageID # 573 Exhibit B ¶ 10). Aleris indicates the information sought is highly confidential, sensitive, proprietary, and encompasses privileged communications (Id.). Aleris also asserts that AIS can look at its SEC filings to ascertain its financial wherewithal during the Project and to the GM documents already provided (Id. PageID # 562-63).

AIS's Reply

In reply, AIS explains that it seeks the requested information not to show Aleris's intent, but rather: (1) to corroborate its theory of the case and its claims that Aleris acted in bad faith pursuant to its claims under the Kentucky Fairness in Construction Act; (2) to rebut Aleris's defenses to AIS's claims and show those defenses are pretextual and false; and (3) to defend against Aleris's counterclaims wherein it alleges AIS was responsible for delays, faulty

---

[5] Eric Rychel is employed by Aleris International, Inc., parent of Aleris Rolled Products, Inc., as its Executive Vice President, Chief Financial Officer and Treasurer (DN 33-2 PageID # 571).

performance or breaches of the AIS Contract on the project resulting in damages to Aleris in an amount in excess of $3.9 million (DN 34 PageID # 575). Further, Aleris failed to cite any case that holds the ability or capacity to pay are not discoverable in a collection case (Id.).

AIS claims that it seeks agreements, communications, and any documents relating to the funding of the project not to show Aleris's intent, but rather to corroborate its theory of the case[6] (DN 34 PageID # 577-78). AIS asserts that this information is relevant to the claims and defenses asserted by the parties in this action (Id.). Further, AIS claims to have a good faith basis to believe that evidence exists pertaining to Aleris waiting for funds from GM to pay its project expenses (Id.). For this reason, AIS believes that communications between GM and Aleris or internal communications of Aleris discussing funding shortfalls relating to the funding agreements, and the GM agreements may exist (Id.).

AIS purportedly seeks the information related to the funding of the project to substantiate and corroborate its claim for costs and attorney fees under the Kentucky Fairness in Construction Act (Id. PageID # 578-79). AIS explains that under the Act it is entitled to costs and attorney fees if it demonstrates that Aleris acted in bad faith when it ordered equipment, supplies, machinery, and work for the project despite knowing it did not have the means to pay for them at the time of the order (Id. PageID # 578-79).

AIS also argues it is seeking information relating to the funding of the project to rebut Aleris' defenses and counterclaims that are based on AIS's purported breaches of the Contract due to delays, failure to meet the project schedule and faulty performance (DN 34 PageID # 579-82).

---

[6] AIS's theory of the case is that Aleris did not have the funds available to pay for the construction of the project at its inception and that Aleris experienced funding shortfalls and budget constraints on the project all of which caused delays, disruptions, inefficiencies, and additional work (DN 34 PageID # 577-78). AIS asserts "that said funding shortfalls, delays and cost-cutting were epidemic on this Project to an unprecedented degree, and infected Aleris' dealings with its prime equipment vendors, its construction manager, engineers and architects (to the extent that after CH2MHill left the Project many were not replaced, or were replaced with recent school graduates lacking construction experience), as well as its prime subcontractors and subcontractors" (Id. PageID # 578).

AIS contends it will rebut Aleris' defenses and counterclaims by establishing the true cause of the project delays was Aleris' inability to pay, funding shortfalls and/or budget constraints[7] (Id.).

AIS argues that Aleris has not complied with all reasonable portions of Request Nos. 1 and 2 because Aleris has failed to produce any documents and/or communications between Aleris and GM relating to funding, lack of funding, delays on the project or other topics relevant to AIS's claims and defenses (Id. PageID # 582). AIS argues that Request Nos. 1 and 2 are not disproportionate, overbroad, unreasonable, vexatious, harassing and unduly burdensome because the information is likely electronically stored in Aleris' accounting system and easily produced as evidenced by Aleris' representation that is has over a million documents contained in its electronic discovery platform (Id. PageID # 582-84).

### AIS's Supplemental Memorandum

AIS argues the GM documents (Capacity Reservation Agreement, the Aluminum Supply Agreement, the Security Agreement, and unsigned February 26, 2015 letter) demonstrate not only that the agreements with GM were funding agreements but that Aleris may have been in default of certain financial covenants under the GM documents resulting in delays on the Project (DN 41

---

[7] For example, Aleris' First Defense alleges that its obligations under the AIS Contract were discharged due to AIS' prior breaches of the AIS Contract which includes not meeting the Project schedule (DN 34 PageID # 579-81). To rebut this defense, AIS intends to assert at trial that Aleris was responsible for any delays and/or any overruns on the Project schedule, and the true cause of the Project delays was Aleris experiencing funding shortfalls and budget constraints that caused Aleris to try to cut costs on the Project and in certain instances slow work on the Project, or experience delays in performance by other entities seeking payment, until the funds were in hand to fund the goods and services ordered and needed (Id.). AIS expects to show that despite Aleris's contractual obligation to maintain a licensed architect on the Project, it terminated the architect on the Project (CH2MHill) and never placed anyone in the position of Architect (Id.). Additionally, Aleris terminated the engineers originally provided by CH2MHill and attempted to provide those critical services in house, by retaining recent engineering graduates with no construction experience because it was cheaper, but this caused delays throughout the Project in a rippling effect (Id.). Further, Aleris switched steel suppliers in the middle of the Project ostensibly to cut costs, but this caused extensive delays on the Project as AIS experienced repeated and substantial delays in the delivery of steel (Id.). And Aleris had pattern and practice of not timely paying its contractors, architect, engineers, construction managers, equipment suppliers and/or vendors-all of which caused delays on the Project (Id.).

PageID # 672-73). The GM Agreements provided at least $80,000,000 in funding[8] that was not only specified for use in the Project work but was tied to milestones incorporating basic construction project elements (Id.). The February 26, 2015 letter, although unsigned, purports to put Aleris on notice that it is in default of its financial covenants under the Capacity Reservation Agreement (Id.). AIS asserts this is potentially direct evidence that Aleris was experiencing financial difficulties in paying project expenses, which ties into its theory of the case (Id.).

Focusing on Aleris's covenant of financial condition in the Security Agreement, AIS points out that it required Aleris to maintain a minimum of $575 million of available credit corporate-wide (DN 41 PageID # 672). Given that Aleris's affiant Mr. Rychel references a $600 million expenditure on the Lewisburg Project, an amount in excess of the $575 million minimum liquidity threshold, AIS believes that Aleris's financial condition was of concern to GM (Id.). Considering the events it encountered on the Project, AIS asserts that persistent and severe cash flow deficiencies infected Aleris and the Project (Id.).

AIS suggests that Aleris may have wanted to utilize an alternative designation of an integral part of its efforts to fund the Project (Id. PageID # 673). Simply styling the agreement with GM as a "construction loan" would require the amounts be booked (and reflected in public filings) as a liability, substantially impacting Aleris's balance sheet at the very time it was actively trying to engineer a sale of the company (Id.). By contrast, an advanced sale could be booked as a contingent asset, thereby dramatically affecting Aleris' balance sheet and its desirability as an acquisition target (Id.). Regardless of the desirability or motivation for Aleris or GM in characterizing the agreements as advanced sales as opposed to funding agreements, AIS asserts that the substance of

---

[8] AIS asserts that the GM documents provided a total sum of up to $200,000,000 to be paid to Aleris to defray certain of its Project expenses (DN 41 PageID # 672).

the provisions of the GM agreements indicates unequivocally that its overriding purpose was to provide funds to Aleris to facilitate the funding of the construction of the Project (Id.).

AIS argues that the GM documents are an imperative piece of evidence relating to the funding issues regarding the Project and relevant to its claims and defenses (DN 41 PageID # 673-75). It points out that the complaint alleges there were persistent delays in payment not only to AIS, but to virtually every entity performing services on the Project[9] (Id.). Further, discovery adduced to date is replete with communications expressing dismay, frustration and anger with chaotic project management and persistent severe delays in payment (Id.). AIS asserts that Aleris should not be permitted to deprive it of access to relevant, material and responsive documents by making a sweeping and unsupported contention about its financial capacity to fund the Project and that it is too burdensome to be required to provide evidence of its financial capacity (Id.).

### Aleris's Supplemental Memorandum

Aleris argues it has complied with the Federal Rules of Civil Procedure with respect to AIS's Request for Production Nos. 1 and 2, its remaining objections are well-taken, and a further fishing expedition into the issues presented in AIS's reply memorandum is not reasonably calculated to lead to the discovery of admissible evidence (DN 42 PageID # 678). Aleris contends that intimate confidential and trade secret information about its internal financial records during the Project is irrelevant for the breach of contract claims in this action because the issue is whether the contract was breached, not the motivation for the breach (Id. PageID # 679-80).[10]

---

[9] AIS claims the construction manager CH2MHill left the Project halfway through CAPL 1 and was never replaced; CH2MHill's architect(s) left and were never replaced by Aleris; CH2MHill's engineers left when it did, to be replaced by graduates fresh out of school lacking any construction experience; that the Project's prime electrical subcontractor, Valley Electric, terminated its contract citing persistent, severe and ongoing difficulties with both construction management and payment; and that CIVES Steel declined to participate in CALP 2 (DN 41 PageID # 673-74).

[10] Aleris adds Sigmon v. Appalachian Coal Props., Inc., 400 Fed. Appx. 43, 50-51 (6th Cir. 2010) and AKH Co., Inc. v. Universal Underwriters Ins. Co., 300 F.R.D. 684, 691 (D. Kan. 2014) to the list of cases in support of its position.

Aleris argues the Capacity Reservation Agreement and the Aluminum Supply Agreement are not funding or loan agreements because they do not mention the word loan, fund, or funding and they do not set forth terms such as an interest rate, a payment plan, or other commercial standard terms that are found in loan agreements (Id. PageID # 680-82). Aleris also points out the four payments of $20 million under the Capacity Reservation Agreement represented about 3% of the overall capital expenditure for the $600 million Project (Id.). Further, in the letter dated September 17, 2014, GM's Executive Director of Global Product Purchasing confirmed that the four payments were in exchange for Aleris reserving exclusive production capacity for GM on the new CALP line (Id.). Likewise, the Aluminum Supply Agreement provides volume commitments and pricing figures on a calendar-year basis should GM choose to exercise its right for exclusive production capacity on the new CALP line(s) (Id.). Next, Aleris points out there is no indication the GM draft correspondence was ever delivered to Aleris but even if it was, GM did not demand a refund of any prior payments (Id.). Instead, the draft letter merely proposed a forbearance period where GM would not enforce any of the payment penalties in the Capacity Reservation Agreement (Id.).

Aleris suggests that AIS's attempt to convince the Court of its theory of the case is improper under LR 7.1 because it has nothing to do with the motion to compel or the relief it originally requested (DN 42 PageID # 682-83). Further, Aleris points out that GM, CH2MHill, CIVES Steel, and Otto Junker have not brought actions against Aleris related to the Project but even if they did, evidence of a dispute or breach of an agreement action between them and Aleris is not relevant in this dispute because the purported breach would involve an entirely different contract in a separate case (Id.).

Aleris reiterates the document productions from GM and Aleris have provided AIS with what it originally sought to obtain in RFP Nos. 1 and 2 (DN 42 PageID # 684-8). Further, there is no legal support for AIS's position that Aleris needs to disclose highly confidential documentation of its assets and liabilities at various times throughout the Project, as the information has no bearing on the issues in this case (Id.). The question of whether Aleris allegedly ran afoul of liquidity assurances with non-party GM is simply not relevant to this dispute because GM's idea of sufficient liquidity is not a claim or defense vis-a-vis AIS and Aleris, nor is it a sufficient threshold of liquidity for payment of AIS's invoices (Id.). Notwithstanding, if AIS wishes to view information about Aleris' financial health, liquidity, indebtedness, and material transactions it can review Aleris' public filings with the United States Securities and Exchange Commission (Id.). Aleris requests the motion to compel be denied in its entirety; Aleris be awarded attorney fees it incurred in opposing the motion; and the Court award Aleris any further relief it deems just and proper (Id.).

## Discussion

Rule 26(b)(1) of the Federal Rules of Civil Procedure guides the evaluation of any discovery request. The Rule provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . ." Fed. R. Civ. P. 26(b)(1). In assessing whether the discovery is "proportional to the needs of the case," courts should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id.; Advisory Committee Notes 2015 Amendment.

Focusing on the relevance prong of Rule 26(b)(1), Count I in the Complaint asserts a breach of contract claim; Count II raises a bad faith claim under the Kentucky Fairness in Construction Act; and Count III presents a quantum meruit/unjust enrichment claim (DN 1 PageID # 17-19). More specifically, the Complaint alleges Aleris was wholly dependent on GM to fund the project because it did not have enough funds of its own (DN 1 ¶¶ 7, 9, 16). Further, the Complaint asserts that delays and disruptions in the Project were in part due to chronic funding shortfalls caused by difficulties in achieving the milestones necessary to receive incremental funding from GM and protracted delays by GM in providing the incremental funding disbursements (Id. PageID # 2-8, ¶¶ 10-14, 50-51).[11] Aleris's Answer denies the funding assertions in AIS's Complaint and asserts Counterclaims accusing AIS of committing numerous material breaches of the Contract (DN 18 PageID # 189-93, ¶¶ 7, 9, 10-14, 16, 50, and 51 and PageID # 206-13).[12] AIS asserts several defenses to Aleris's counterclaims (DN 19).

The Court agrees with AIS that agreements/contracts pertaining to the funding of the Project and Aleris's investment in the Project is relevant under this Rule to both AIS's claims in the Complaint and its defenses to the counterclaims in Aleris's Answer (see Request No. 1).

---

[11] The complaint also alleges that delays, disruptions, and inefficiencies on the Project were the product of other factors such as Aleris's failure to provide the architect's duties under the AIS contract; the design drawings provided by Aleris contained errors and omissions; Aleris's failure to provide necessary project management and equipment information; Aleris's failure to provide proper concrete foundations delayed steel erection; Aleris's failure to provide the designated storage and laydown areas for staging and assembly; Aleris's failure to timely provide concrete foundations resulted in an alteration of AIS's planned sequence of erection and equipment setting; Aleris's decision to coat the flooring after erection of the structural steel columns delayed the survey necessary to establish the Centerline to ensure vertical alignment of all equipment AIS installed; Aleris's failure to timely deliver equipment; Aleris directed AIS to conduct outside out-of-scope assembly work; and Aleris delayed delivery of structural steel on CALP 2 (DN 1 PageID # 9-15).

[12] Aleris indicates AIS's material breaches of the Contract include but are not limited to the following: failing to properly staff the job with adequately skilled workers; failing to properly staff the job with proper supervisory and management personnel; failing to meet the project schedule; failing to adhere to the proposed work hours; failing to complete base scope work under the AIS Contract; failing or refusing to cure defective and nonconforming work; failing to complete the work in a good and workmanlike manner; failing to send timely notice of any purported claim; failing to maintain a clean job site; improperly billing Aleris for base scope work as purported change orders; failing to provide Aleris with credits due under the AIS Contract; and failing to accelerate its work despite being compensated to do so (DN 18 PageID # 210-11).

Further, documents/communications pertaining to the performance, breach, expiration, and termination of the funding agreements/contracts would also be relevant to AIS's claims and defenses (*see* Request No. 2). But AIS has not demonstrated how documents/communications pertaining to the negotiation and drafting of the funding agreements/contracts for the Project would be relevant to AIS's claims and defenses (*see* Request No. 2).

The Court finds that most of the cases cited by Aleris do not even address relevance under Rule 26(b)(1). Four of the cases concern admissibility of intent or motive evidence. *See* Coker v. McFaul, 247 Fed. Appx. 609, 615-17 (6th Cir. 2007) (defendant's state of mind is not relevant to an entitlement claim under the Family Medical Leave Act); HM Compounding Services, LLC v. Express Scripts, Inc., 349 F. Supp. 3d 794, 804 (E.D. Mo. 2018) (expert witness's opinion on a party's state of mind is not relevant on a breach of contract claim under Missouri law); Shathaia v. Travelers Cas. Ins. Co. of Am., 984 F. Supp. 2d 714, 722 (E.D. Mich. 2013) (under Michigan law a contracting party's motives and subjective intentions are not relevant evidence in determining whether a promise has been made to benefit a person who is not a party to a contract); McDougal v. Altec Indus., Inc., 553 F. Supp. 2d 862, 871 (W.D. Ky. 2008) (an employer's intent is not relevant to an interference claim under the Family Medical Leave Act). One of the cases addressed whether the plaintiffs demonstrated an alleged breach of a noncompete agreement was the but-for-cause of their purported damages. Human Services Consultants, Ltd. v. Tamule, CV 06-0486ML, 2008 WL 11390850, at *9 (D.R.I. June 30, 2008). None of these cases apply to the dispute before the Court because Rule 26(b)(1) unequivocally indicates "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."

While Aleris has cited three cases addressing relevance under Rule 26(b)(1), those cases are distinguishable from the circumstances before the Court. For example, in Sigmon v.

13

Appalachian Coal Props., Inc., the Sixth Circuit concluded the trial court did not abuse its discretion when it denied the real estate broker's discovery request because the broker need only show the seller's refusal to consummate the sale to make out a breach of contract claim. 400 Fed. Appx. 43, 50-51 (6th Cir. 2010). But the Sixth Circuit also acknowledged that motive for the refusal was a relevant defense to such a breach of contract claim as the seller must demonstrate a valid reason for refusing to consummate the sale. Id. Aleris has also cited Mid Am. Sols. LLC v. Vantiv, Inc., where the district court denied the plaintiff's motion to compel and granted a motion to quash discovery requests that the plaintiff claimed were relevant to show fraudulent behavior on the part of a specific defendant. 1:16-MC-2, 2016 WL 1611381, at *9 (S.D. Ohio Apr. 20, 2016). The district court explained that the plaintiff had not pleaded a fraud claim against that specific defendant and the information sought in the discovery requests was not relevant nor crucial to the plaintiff's surviving breach of contract claim against that defendant. Id. Further, Aleris has cited AKH Co., Inc. v. Universal Underwriters Ins. Co., where the district court denied the plaintiff's motion to compel as the discovery requests sought information regarding whether the defendant has breached its duties under other contracts. 300 F.R.D. 684, 691 (D. Kan. 2014). The district court explained that such general information was irrelevant as to whether the defendant breached the contract at issue. Id. The circumstances here are distinguishable from these three cases because AIS seeks the requested information to corroborate its claims that Aleris acted in bad faith pursuant to its claims under the Kentucky Fairness in Construction Act and rebut Aleris's breach of contract counterclaim and defenses.

In sum, except for the portion of Request No. 2 that seeks documents/communications pertaining to the negotiation and drafting of the funding agreements/contracts for the Project, AIS has adequately demonstrated that Request Nos. 1 and 2 seek information that is relevant within the

meaning of Rule 26(b)(1). While Aleris strenuously rejects AIS's characterization of the Capacity Reservation Agreement, the Aluminum Supply Agreement, and the Security Agreement as funding or loan agreements, Aleris acknowledges receiving $80 million from GM pursuant to those agreements in exchange for production priority on the CALP line(s) upon completion. More importantly, Aleris has not denied using the money to pay Project expenses. Thus, these agreements between Aleris and GM pertain to funding of the Project and fall within the scope of Request No. 1. Further, documents and communications between Aleris and GM regarding performance, breach, expiration and termination of these agreements fall within the scope of Request No. 2.

The Court will now address the proportionality prong under Rule 26(b)(1). Notably, Aleris raises the issue of proportionality only as to Request No. 1. It contends to the extent Request No. 1 seeks Aleris's own financial and accounting records demonstrating how it paid for all the invoices transmitted on what was a more than $600 million project, the request is disproportionate, overbroad, unreasonable, vexatious, harassing, and unduly burdensome (DN 33 PageID # 562-63; DN 33-2 PageID # 573 Declaration of Eric M. Rychel). More specifically, Mr. Rychel declares:

> Aleris would be forced to sift through thousands of invoices and hundreds and thousands of pages of internal documents, including highly confidential and proprietary financial and accounting records, meeting minutes, and banking information, among other things, and determine how each expenditure was classified. This information is highly confidential, sensitive, proprietary, and also encompasses privileged communications, in addition to being a massive undertaking.

(DN 33-2 PageID # 573 ¶ 10). Additionally, Aleris suggests that AIS has an available alternative source for this information (DN 33 PageID #561-62). Specifically, AIS should review Aleris's public filings with the SEC to obtain information about its financial health, liquidity, indebtedness, and material transactions (Id.).

15

AIS responds by pointing out that it previously propounded Document Request No. 40 which sought from Aleris's accounting system invoice reports, payment history reports, job costs and billing details, job status reports, and any other reports generated by the accounting software related to the Project (DN 34 PageID # 583-84). AIS asserts that Aleris agreed to produce all relevant non-privileged documents requested (Id.). AIS argues that it is neither harassing nor burdensome for Aleris to produce its accounting records relating to project funds and costs because they are likely easily retrieved from Aleris's electronic accounting system or its electronic discovery platform (Id.). Finally, AIS asserts that the documents it seeks are not available through public filings with the SEC and may not be available from the GM production as internal emails and/or memos are only available through Aleris (Id.).

In making their arguments, both parties failed to appreciate the wording of Request No. 1. In pertinent part, it asks for documents relating to Aleris's investment in the Project (DN 30 PageID # 543). But it does not seek production of documents pertaining to Aleris's outlay of those funds to Project expenses. Although Document Request No. 40 may seek such documentation, it is not the subject of AIS's motion to compel presently before the Court. Further, Aleris's filings with the SEC are not an adequate substitute for the Project specific documentation sought in Request No. 1. Thus, to provide a fulsome response to Request No. 1, Aleris need only produce documents pertaining to its investment or financial input in the Project and it is not required to provide records relating to the spending of those funds. Further, Aleris's proportionality argument is moot because it concerns material not actually sought by Request No. 1.

Notwithstanding, the Court has considered the importance of the issues at stake in this action, the millions of dollars in controversy, Aleris's relative access to the requested documentation, it's resources, the importance of the document request in resolving the claims and

defenses asserted in this action, and whether the burden or expense of the proposed document request outweighs its likely benefit. Fed. R. Civ. P. 26(b)(1). The Court concludes to the extent that Request No. 1 seeks production of documents relating to Aleris's investment in the Project it is proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

The Court is aware of Aleris's claims that Request Nos. 1 and 2 seek documents that are highly confidential, sensitive, proprietary, and encompass privileged communications. The stipulated protective order (DN 24) is intended to address highly confidential, sensitive, and proprietary documents. As to documents that may contain privileged communications, Aleris is reminded that Rule 26(b)(5) applies and sets forth the procedure it must follow to preserve such claims.

## ORDER

**IT IS HEREBY ORDERED** that AIS's motion to compel (DN 30) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Aleris must respond to Request Nos. 1 and 2 as directed above **by no later than April 10, 2020**.

February 27, 2020

*H. Brent Brennenstuhl*
**H. Brent Brennenstuhl**
**United States Magistrate Judge**

Copies: Counsel